UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In Re: ) | |
| ) | |
| PRESIDENT CASINOS, INC., ) | Case No. 02-53005-659 |
| ) | Judge Kathy A. Surratt-States |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |
| STUART A. WILLIAMS, Trustee to The Stuart ) | **Adversary No. 13-4151-659** |
| A. and Francine W. Williams Revocable Trust, ) | |
| ) | **PUBLISHED** |
| Plaintiff, ) | |
| ) | |
| -v- ) | |
| ) | |
| HENRY L. GUSKY, in his capacity as ) | |
| Liquidation Trustee of President Casinos, Inc., ) | |
| Liquidation Trust, ) | |
| Defendant. ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The matters before the Court are Complaint filed by Stuart A. Williams, Trustee of the Stuart A. and Francine W. Williams Revocable Trust, Motion to Dismiss for Failure to State a Claim and Failure to Join Required Parties, Memorandum in Support of Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted and for Failure to Join Required Parties, Brief in Opposition to Motion to Dismiss, Motion to Enforce Settlement Agreement or in the Alternative for New Scheduling Order and Other Relief and Plaintiff's Preliminary Statement in Response to Motion to Enforce Settlement Agreement or in the Alternative for New Scheduling Order and Other Relief. Upon consideration of the record as a whole, the Court rules as follows.

## FINDINGS OF FACT

On June 20, 2002, Debtors President Casinos, Inc. (hereinafter "PCI"), PRC Management, Inc. (hereinafter "PRC-MGT") and several affiliated companies (hereinafter collectively the "Debtors"), filed Voluntary Petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Mississippi. By Orders dated October 18, 2002 and

December 16, 2002, the Mississippi Bankruptcy Court transferred the cases to this Court. Debtors continued to operate and manage their businesses and financial affairs as Debtors in Possession.

On August 27, 2008, PCI and PRC-MGT filed the Jointly Proposed Chapter 11 Plan of Liquidation of President Casinos, Inc. and PRC Management, Inc. (hereinafter the "Plan"). On November 25, 2008, this Court confirmed the Plan. *See* Amended Order Confirming Chapter 11 Plan of Liquidation for President Casinos Inc. and PRC Management, Inc., November 25, 2008 (hereinafter "Confirmation Order").

Pursuant to the Plan, PCI and PRC-MGT dissolved on December 8, 2008 – the Effective Date of the Plan. Section 5.3 of the Plan provides for the creation of a Liquidation Trust into which Debtors were required to contribute all remaining assets of Debtors. Thereafter, Debtors were required to file certificates of dissolution in the appropriate jurisdictions.

PCI and PRC-MGT were involved in litigation with Columbia Sussex Corporation (hereinafter the "Columbia Sussex Litigation") when the Plan was confirmed. The Columbia Sussex Litigation was also included in the assets to be held by the Liquidation Trust.

The Plan also contemplated the execution of a Liquidation Trust Agreement (hereinafter "LTA") and the designation of a Liquidation Trustee. The lta was executed and Trustee Henry Gusky, Esq. (hereinafter "Trustee Gusky") was appointed as the Liquidation Trustee. LTA, § 3.1.

On the Effective Date of the Plan, all equity interests in PCI were cancelled and holders of equity interests in PCI that are "Allowed Equity Interests,"[1] also called the Record Holders, were automatically entitled to receive their proportionate share of the distributions from the Liquidation Trust. Plan, §§ 3.2(g)(2); 5.3(a), 5.3(n). Such individuals are Beneficiaries of the Liquidation Trust, and therefore hold a Beneficial Interest in the Liquidation Trust.

---

[1] Pursuant to Section 1.1 of the Plan, "Allowed Equity Interest" or "Allowed Interest" means an Equity Interest that (a) is registered as of the Distribution Record Date in a stock register maintained by the Stock Transfer Agent and (b) is not a disputed interest.

Section 6.6 of the Plan provided for the equity transfer and claims register to be closed effective as of the close of business on the Distribution Record Date with no further changes in the Record Holders of any Claim or Equity Interest.[2] Plan, § 6.6. Paragraph F of the Confirmation Order states that the Distribution Record Date shall be the Effective Date of the Plan – December 8, 2008. Confirmation Order, November 25, 2008, at 8. Both the Plan and the LTA state that effective as of the close of business on the Distribution Record Date, neither Debtors nor Trustee Gusky shall have any obligation to recognize any transfer of any Equity Interest occurring after the Distribution Record Date, "and shall be entitled instead to recognize and deal for all purposes hereunder with only those Record Holders stated on the transfer ledgers or the claims register as of the close of business on the Distribution Record Date." Plan, § 6.6; LTA § 5.1(d). Further, pursuant to Section 8.2 of the LTA, the interest of the Beneficiaries in the Liquidation Trust were not negotiable and could not be transferred except under the laws of descent and distribution in the case of a deceased individual Beneficiary or by operation of law, and, only after written notice to and acceptance and recording by the Trustee Gusky. LTA, § 8.2.

Prior to cancellation, PCI's stock was held either directly by the owner of the Equity Interest, and therefore that person was registered as the owner of the stock on PCI's equity transfer ledger, or indirectly in "street name." Stock held in street name appears on PCI's equity transfer ledger in the name of the broker of the owner of the PCI stock or the broker's security depository and clearing agency rather than in the name of the owner of the PCI stock, otherwise called the Beneficial Owner of the PCI stock. In these circumstances, the Beneficial Owner's broker keeps a record of the identity of the owner of the stock, and the stock is instead registered in the broker's name.

---

[2] Under Section 1.1 of the Plan, "Equity Interest" means any equity interest in PCI, including, but not limited to, all issued, unissued, authorized or outstanding shares of stock (including common stock or preferred stock), together with any existing options, warrants or rights, contractual or otherwise, to acquire such equity interests at any time.

The Depository Trust Company (hereinafter "DTC") is a securities depository and clearing agency registered with the Securities and Exchange Commission and is engaged in the settlement of trades in corporate and municipal securities on behalf of its participants which are typically banks and brokers.  As such, DTC acts as a clearing house for publicly traded securities and maintains physical custody of certificated securities for its participants and the Beneficial Owners.  All securities deposited with DTC by DTC's participants are held in the name of DTC's nominee, Cede & Co. (hereinafter "Cede").

After the Effective Date, various brokers continued to trade PCI's cancelled stock held in street name.  These stock transactions were never recorded in PCI's equity transfer ledger because they took place after the PCI stock was cancelled and because they were held in street name.  As previously indicated, PCI would not ordinarily know the identity of either the seller or purchaser of the PCI stock held in street name.  In an effort to stop the continued trading of the cancelled PCI stock, Trustee Gusky prepared and signed a letter to the brokers who continued to execute trades of PCI stock after the Distribution Record Date, and that letter was sent to the various brokers by electronic mail. The electronically sent letter did not achieve the intended effect in that trading the cancelled PCI stock continued.  After contact from Trustee Gusky, in May of 2011, the Financial Industry Regulatory Authority (hereinafter "FINRA") successfully halted the trading of PCI's cancelled stock.

The Columbia Sussex Litigation was ultimately settled and funds became available to the Liquidation Trust for distribution.  Trustee Gusky retained Computershare Trust Company, N.A. (hereinafter "Computershare") to act as the Liquidation Trust's Disbursing Agent.  In July 2011, the Trustee commenced a "First Liquidation Distribution" to holders of Allowed Equity Interests – the Record Holders – as contemplated by the Plan.

In connection with the First Liquidation Distribution, a first letter dated July 15, 2011 was send by Trustee Gusky to the holders of PCI Stock as of the Effective Date according to PCI's

equity transfer ledger (hereinafter "Record Holder Letter"). Also on July 15, 2011, Trustee Gusky prepared a second letter, which was given to DTC for DTC to provide to its clients (hereinafter "DTC Letter"). The Record Holder Letter and the DTC Letter stated among other things that the First Liquidation Distribution "is in an aggregate amount equal to $9,500,156.75, or $1.75 per share of [PCI stock] outstanding on the [Distribution] Record Date immediately prior to the cancellation of such shares in accordance with the terms of the Plan." Record Holder Letter, at 2; DTC Letter, at 2. The Record Holder Letter and the DTC Letter also states the following:

> Section 6.6 of the Plan provides that the President Casinos' equity transfer register was to be closed effective as of the close of business on the [Distribution] Record Date, with there being no further changes to be made to the [R]ecord [H]olders of any equity interest in President Casinos. Section 6.6 of the Plan further provides that the Liquidation Trustee has no obligation to recognize any transfer of any equity interest in President Casinos occurring after the [Distribution] Record Date and shall be entitled instead to recognize and deal for all purposes under the Plan with only those [R]ecord [H]olders stated on the transfer ledgers as of the close of business on the [Distribution] Record Date. In accordance with Section 6.6 of the Plan, the First Liquidation Distribution and any future distribution from the Liquidation Trust ... will be paid only to [Record] Holders and not to any other party which purports to have acquired any interest in Common Stock after the [Distribution] Record Date.

Record Holder Letter, at 2-3; DTC Letter, at 2-3.

In accordance with the Plan, as previously mentioned, the First Liquidation Distribution was to be made to persons who were Record Holders of stock in PCI on the Distribution Record Date of December 8, 2008. Roughly two-thirds of PCI stock was held in street name, for all of which, Cede, as nominee for DTC, was the Record Holder. Accordingly, most of the funds disbursed as part of the First Liquidation Distribution by Computeshare, as agent to Trustee Gusky, went to DTC, in the name of Cede, for redistribution to the Beneficial Owners of the stock. DTC's records only identify the broker and financial institution participants who held the shares and the total number of shares held by each such Participant and such, DTC does not know the identify of the Beneficial

Owners of stock held in the name of Cede.

Plaintiff Stuart A. Williams (hereinafter "Mr. Williams") is the Trustee of the Stuart A. and Francine W. Williams Revocable Trust (hereinafter the "Revocable Trust"). Between 1996 and 2006, the Revocable Trust purchased 174,100 shares of PCI stock which were held in street name. Prior to the Effective Date, the 174,100 shares were transferred to Charles Schwab & Co., Inc. (hereinafter "Charles Schwab") but the 174,100 shares remained in street name and the Revocable Trust remained the Beneficial Owner of the PCI stock. With knowledge of the Plan and its contents, Mr. Williams caused 61,000 of the 174,100 shares to be sold after December 8, 2008 – the Distribution Record Date.[3]

Computershare sent the appropriate funds to DTC to reflect the 174,100 shares held in the name of Cede for which the Revocable Trust was the Beneficial Owner on the Distribution Record Date. DTC then sent the appropriate funds to Charles Schwab based on DTC's records of the total shares for which Charles Schwab was the broker. Charles Schwab made a disbursement of $197,925.00 to the Revocable Trust, which reflects $1.75 per share for 113,100 shares, which is the amount of shares for which the Revocable Trust was the Beneficial Owner as of July 2011 rather than the Distribution Record Date of December 8, 2008. As such, the Revocable Trust did not receive any distribution for the 61,000 shares of PCI stock that were sold after the Distribution Record Date. Mr. Williams has filed suit against DTC and Cede in the United Stated District Court for the Western District of Pennsylvania and has also asserted a non-judicial claim against Charles Schwab in connection with the First Liquidation Distribution.

On July 10, 2013, Mr. Williams commenced this adversary proceeding and on September 6, 2013, Trustee Gusky and Mr. Williams filed Joint Motion to Stay Proceedings Pending Execution

---

[3] Mr. Williams states that prior to selling the 61,000 shares, Mr. Williams contacted Trustee Gusky and was assured that even if the 61,000 shares were sold after the Distribution Record Date, the Revocable Trust would still be entitled to the associated liquidation distribution for those sold shares.

of Settlement Agreement which states that Trustee Gusky and Mr. Williams "have reached a tentative settlement which the parties believe will resolve all claims between them." Joint Motion to Stay Proceedings Pending Execution of the Settlement Agreement, September 6, 2013, ¶ 3. Also on September 6, 2013, Trustee Gusky sent Mr. Williams a draft document which purported to memorialize a settlement of the matters in the Complaint in addition to a declaration which Trustee Gusky intended to execute. The Settlement negotiations ultimately reached an impasse in large part because, after several drafts, Mr. Williams insisted on additional language in Trustee Gusky's declaration to the effect that neither Trustee Gusky nor Computershare were ever part of a discussion with DTC, Cede or DTC's participants – such as Charles Schwab – which concerned dissemination of the First Liquidation Distribution to holders of PCI stock as of any date other than December 8, 2008, and Trustee Gusky refused to include this language.

    Mr. Williams argues that he relied on at least the Plan and the Record Holder Letter (or the DTC Letter) and believed that distributions of the First Liquidation Distribution would ultimately be made to the Beneficial Owners as of December 8, 2008, and therefore, he caused 61,000 shares of cancelled PCI stock to be sold with the expectation that the Revocable Trust would still receive the proportionate distribution of the First Liquidation Distribution for those sold cancelled shares. Therefore, Mr. Williams argues that receipt of a distribution pursuant to the First Liquidation Distribution for any amount other than the amount due for all 174,100 shares held in street name by the Revocable Trust on the Distribution Record Date violates the Plan. Mr. Williams further states that Trustee Gusky was aware of the potential for distributions following the initial disbursement by Computershare to be made based on ownership records other than those held by Trustee Gusky on the Distribution Record Date but did not take action to prevent this ultimate result. Therefore, Mr. Williams argues that he is entitled to Declaratory Judgment that Trustee Gusky was required under the Plan to ensure that the First Liquidation Distribution was ultimately paid to the Beneficial Owners of the PCI stock held in street name, that Trustee Gusky breached

his fiduciary duties in this regard and that Trustee Gusky was negligent. Mr. Williams further argues that no settlement was reached between him and Trustee Gusky, rather, he merely explored the possibility of settlement.

Trustee Gusky argues that the PCI stock for which the Revocable Trust is the Beneficial Owner has at all relevant times been held in the name of Cede in that those PCI shares were held in street name. As such, pursuant to the Plan, Trustee Gusky was required to make a distribution to the Record Holder of the PCI stock, which was Cede, and Trustee Gusky argues that he fulfilled his duty upon Computershare's transfer of the appropriate funds to Cede, as nominee for DTC. Trustee Gusky argues that he has no control over DTC's actions, or the actions of Charles Schwab, in that Trustee Gusky cannot compel DTC or Charles Schwab to comply with the terms of the Plan. Trustee Gusky further argues that he and Mr. Williams did reach a settlement of the matters which should be enforced despite Mr. Williams' dilatory demands made for the first time on the eve of execution of the settlement.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 151, 157, and 1334 (2002) and Local Rule 81-9.01(B) of the United States District Court for the Eastern District of Missouri. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O) (2002). Venue is proper in this District under 28 U.S.C. § 1409(a) (2002).

## CONCLUSIONS OF LAW

The Court must determine whether the allegations contained in the Complaint survive Trustee Gusky's Motion to Dismiss. The Court must also determine whether Trustee Gusky and Mr. Williams have reached an enforeceable settlement.

A complaint should not be dismissed unless it appears beyond doubt that the plaintiff cannot prove the facts that would entitle him to the relief requested in the complaint. *Rucci v. City of Pacific,* 327 F.3d 651, 652 (8th Cir. 2003). "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1973, 167 L.Ed.2d 929 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. at 1965).  This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  It enables the court to weed out groundless claims "at the point of minimum expenditure of time and money by the parties and the court." *Twombly,* 550 U.S. at 558, 127 S.Ct. at 1966.

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555, 127 S.Ct. at 1965 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 2944-45, 92 L.Ed.2d 209 (1986)). Thus, "naked assertion[s] devoid of further factual enhancement" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Iqbal,* 556 U.S. at 678, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 555, 127 S.Ct. at 1965).

Generally, if "on a motion to dismiss under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment." Fed. R. Civ. P. 12(d) (2002).  However, documents "'necessarily embraced by the complaint' are not matters outside the pleading for purposes of a motion to dismiss under Rule 12." *Enervations, Inc. v. Minn. Mining & Mfg. Co.,* 380 F.3d 1066, 1069 (8th Cir. 2004).  Thus, "[a] court need not convert a Rule 12(b)(6) motion to dismiss into on[e] for summary judgment under Rule 12(d) if the matters presented are incorporated by reference, are integral to the claim, or are exhibits whose authenticity is unquestioned." *Reitz v. Nationstar Mortg., LLC,* __ F.Supp.2d __, 2013 WL 3282875, at *2 (E.D. Mo. June 27, 2013) (citing *Miller v. Redwood Toxicology Lab., Inc.,*

-9-

688 F.3d 928, 931 (8th Cir. 2012)).

While a court must view the allegations of the complaint in the light most favorable to the plaintiff in deciding a motion to dismiss, if "certain allegations are inconsistent with the terms of a written document that is attached to or otherwise considered part of the complaint, the inconsistent allegations are not accepted as true, and the terms of the written document, fairly construed, prevail." *Dames & Moore v. Baxter & Woodman, Inc.,* 21 F. Supp. 2d 817, 823 (N.D. Ill. 1998) (citing *Perkins v. Silverstein,* 939 F.2d 463, 469 n. 4 (7th Cir. 1991)); *see also Honess 52 Corp. v. Town of Fishkill,* 1 F.Supp.2d 294, 300 (S.D.N.Y. 1998) ("if the allegations of a complaint are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the complaint") (citation omitted); *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295-96 (9th Cir. 1998) (the court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint") (citations omitted); *Olpin v. Ideal Nat. Ins. Co.,* 419 F.2d 1250, 1255 (10th Cir. 1969) (the court is not "bound to accept mere legal conclusions or factual claims at variance with the express terms of" a document that is made part of the complaint by reference) (citations omitted).

The use of financial intermediaries and holding stock in street name facilitates the implementation of customized financial services such as cash management accounts, brokerage margin accounts, discretionary trust and dividend reinvestment programs.

> In a brokerage margin account, the broker holds the customer's securities as collateral against any margin debt generated by the customer's stock market transactions. Dividends and other distributions may be credited against a customer's margin debt to the broker. In a discretionary trust, the financial institution as trustee enjoys the discretion not to distribute current income but rather to accumulate it for further investment. In a dividend reinvestment program, the beneficial owner authorizes the broker to use dividends to purchase additional shares and fractional shares...The economies of scale attained in the modern financial services industry are epitomized by the securities depository, a large institution that holds only the accounts of 'participant' brokers and banks and serves as a clearinghouse for its participants' securities transactions. Because

> a depository retains record ownership of securities, it effectively 'immobilizes' the certificates in its possession by allowing its participants to trade securities without the physical transfer of certificates

*Delaware v. New York,* 507 U.S. 490, 495-96, 113 S. Ct. 1550, 1554-55, 123 L.Ed.2d 211, n. 3-5 (1993). Street name accounts also permit changes in beneficial ownership to be effected through book entries rather than the unwieldy physical transfer of securities certificates. *See* Brown, The Shareholder Communication Rules and the Securities and Exchange Commission: An Exercise in Regulatory Utility or Futility?, 13 J.Corp.L. 683, 688-691 (1988).

A court is authorized to enforce a settlement. "The essential elements of a valid settlement agreement are the involvement of parties who are competent to contract, a proper subject matter, legal consideration, mutuality of obligation, and mutuality of agreement." *Chaganti & Associates, P.C. v. Nowotny,* 470 F.3d 1215, 1221 (8th Cir. 2006) (citing *L.B. v. State Comm. of Psychologists,* 912 S.W.2d 611, 617 (Mo. App.1995)). Mutuality of obligation means that there is consideration which is a benefit to the promisor or a detriment to the promisee. *See Citibank (South Dakota), N.A. v. Wilson,* 160 S.W.3d 810, 813 (Mo. App. 2005); *State ex rel. Vincent v. Schneider,* 194 S.W.3d 853, 859 (Mo.2006). Mutuality of agreement occurs when there is a "meeting of the minds" between the parties in that the parties have expressed their intentions in their words or acts. *L.B.,* 912 S.W.2d at 617. Under Missouri law, a client must give an attorney the authority to enter into a settlement agreement. *McDowell v. Kearns,* 758 S.W.2d 481, 482–83 (Mo. App.1988). "A court, however, will presume that an attorney has the necessary authority if the attorney's statements or conduct imply the authority to settle." *Chiganti & Associates, P.C.,* 470 F.3d. at 1222 (citation omitted). The client has the burden to prove that the attorney settled a matter without authority to do so. *Stewart v. M.D.F., Inc.,* 83 F.3d 247, 251 (8th Cir. 1996); *Greater Kansas City Laborers Pension Fund v. Paramount Indus.,* 829 F.2d 644, 646 (8th Cir.1987).

At the outset, Mr. Williams references and specifically relies upon the Plan, the LTA, the

Record Holder Letter and the DTC Letter. This Court therefore considers these documents to be part of and integral to the Complaint.

This Court's review of the Confirmation Order, Plan and the LTA, as well as the Record Holder Letter and the DTC Letter, all compel the conclusion that in connection with the First Liquidation Distribution, Trustee Gusky fulfilled his obligations as the Liquidation Trustee. The Plan and the LTA obligated Trustee Gusky to make the First Liquidation Distribution to Record Holders as of the Distribution Record Date of December 8, 2008. Trustee Gusky, through his agent Computershare, fulfilled this obligation. The shares of PCI stock for which the Revocable Trust was the Beneficial Owner were held in street name, and therefore, Cede, as nominee for DTC, was the Record Holder. As such, in compliance with the Plan, the First Liquidation Distribution was made to Cede, as nominee for DTC. DTC itself does not know that actual identity of the Beneficial Owners of the PCI stock which it holds in the name of Cede, rather, DTC knows the identify of the brokers of the Beneficial Owners of the PCI stock. Accordingly, DTC distributed the funds received from Computershare to the appropriate brokers in accordance with DTC's records among which included Charles Schwab. Charles Schwab then, based on its records of the holders of the PCI stock at that time rather than as of the Distribution Record Date, made its distribution.

Though the use of financial intermediaries such as banks, brokers and depositories facilitates the implementation of investment opportunities, this financial mechanism creates certain challenges to the bankruptcy administration because the intermediaries, here DTC and Charles Schwab, are not subject to the Plan and are not bound by the Plan and LTA. Nonetheless, neither the Plan nor the LTA compel Trustee Gusky to go beyond his enumerated duties and responsibility to ensure that the First Liquidation Distribution is made in compliance with the Plan. As such, Trustee Gusky had no obligation, or legal authority, to dictate to the other entities implicated in this matter such as Cede, DTC, or the various DTC participants such as Charles Schwab, that they are likewise compelled to disregard subsequent transfers of the cancelled PCI stock and that

disbursement of the funds received from the First Liquidation Distribution must be performed in such a manner where the beneficiaries of stock held in street name must receive the same ultimate treatment as those who held their PCI stock directly.  Trustee Gusky caused the appropriate disbursement to be made based on his records as of the Distribution Record Date.  Charles Schwab allocated only the amount to which the Revocable Trust was entitled on the date of disbursement rather than what the Revocable Trust would have been entitled to on the Distribution Record Date.  Ultimately, Trustee Gusky was only required to deal with Record Holders as of the Distribution Record Date, and not the Beneficial Owners of the PCI stock, whose identity was unknown to Trustee Gusky.

Likewise, Mr. Williams advances a theory that Trustee Gusky breached his fiduciary duty by "failing to disregard any attempted transfer of shares in President Casinos stock occurring after the [Distribution] Record Date, despite a Court Order prohibiting such transfers." Complaint, ¶ 55.  At the outset, that Mr. Williams would make this argument strains credulity given that it was Mr. Williams' decision to transfer the 61,000 shares of PCI stock after the Distribution Record Date that caused his current circumstances.  Had Mr. Williams not sold or caused to be sold the 61,000 shares of PCI stock, which he knew had been cancelled, in hopes that he could realize gains for selling the cancelled PCI stock and still receive the associated distributions from the Liquidating Trust, Mr. Williams would have received the distributions he seeks today.

It is unclear the level to which Mr. Williams believes Trustee Gusky's fiduciary duties rise.  Irrespectively, under no circumstances can Trustee Gusky's fiduciary duties rise to a level of legal impossibility, even assuming all facts that are not contradicted by the documents that are part and parcel to the Complaint in the light most favorable to Mr. Williams.  Trustee Gusky can only do that which he is required to do under the Plan and LTA, and that which he is authorized to do by law.  This does not include control of the stock market.  It also does not include control over Cede, DTC or DTC's participants such as Charles Schwab.  When Trustee Gusky became aware of the

continued trading of cancelled PCI stock, Trustee Gusky took a reasonable first step and sent a letter to various brokers and dealers and requested that the trade of PCI Stock be halted. When this proved unsuccessful, Trustee Gusky contacted FINRA. These actions are not outrageous, wanton, malicious and oppressive, nor are Trustee Gusky's actions the proximate cause of the complained injury to the Revocable Trust and Mr. Williams.

Therefore, viewing all alleged facts that are not contradicted by the documents made part of the Complaint and that are beyond threadbare recitals in the light most favorable to Mr. Williams, Mr. Williams has failed to state any claim against Trustee Gusky upon which relief can be granted. Mr. Williams' issue is with the very stock trading system that facilitated his decision to sell the cancelled PCI Stock after the Distribution Record Date. Any other potential solution is presently beyond the scope of the matters before this Court and, perhaps, lie in other pending litigation. Therefore, by separate Order, the Motion to Dismiss will be granted in part[4] and the Motion to Enforce Settlement will be denied as moot.

_Kathy A. Surratt-States_
KATHY A. SURRATT-STATES
Chief United States Bankruptcy Judge

DATED: December 2, 2013
St. Louis, Missouri

---

[4] Alternatively, this Court would nonetheless have dismissed Counts I and III for failure to state a claim on the basis that the exculpatory provisions of the Plan and LTA, particularly Section 5.3(v) of the Plan and Section 3.6(a) of the LTA, are valid affirmative defenses for Trustee Gusky under Eighth Circuit law and Missouri law. *See* Plan, §§ 1.5, 5.3(v); LTA, §§ 3.6(a), 11.2.; *C.H. Robinson Worldwide, Inc. v. Lobrano,* 695 F.3d 758, 764 (8th Cir. 2012) (quoting *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir.2008)); *Warren v. Paragon Techs. Group, Inc.,* 950 S.W.2d 844, (Mo. 1997) (en banc) (citation omitted).

-14-

Copies to:

Office of the United States Trustee
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Suite 6.353
St. Louis, MO  63102

Matthew S Layfield
Polsinelli
100 South Fourth Street
Suite 1000
St. Louis, MO 63102

Brian Wade Hockett
Thompson Coburn LLP
One US Bank Plaza
St. Louis, MO 63101

Sherry K. Dreisewerd
Polsinelli Shughart PC
100 South Fourth Street
Suite 1000
St. Louis, MO 63102

Henry L. Gusky, in his capacity as Liquidation
Trustee of President Casinos, Inc., Liquidation
Trust
Blumling & Gusky, LLP
1200 Koppers Bldg
Pittsburgh, PA 15219

Joseph Leibowicz
K&L Gates LLP
210 Sixth Ave.
Pittsburgh, PA 15222